## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No.  4:14CR0343  CEJ/TCM |
| | ) |
| DAMIEN MORGAN, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM

This matter is before the Court on a motion filed by Damien Morgan (Defendant) to suppress evidence and statements.  [Doc. 29]  An evidentiary hearing was held on February 24, 2015, at which Defendant, represented by Assistant Public Defender Beverly A. Beimdiek, and Assistant United States Attorney Erin Granger, representing the Government. The Government produced the testimony of St. Louis Police Detectives Michael Spreck and David Wilferd.  Government Exhibits 1-5 and Defendant's Exhibit A were admitted into evidence.

Based upon the evidence adduced at the evidentiary hearing and the applicable law the undersigned finds and concludes as follows.

### Findings of Fact

1.     Detective Spreck has been a police officer for nineteen years and assigned to the Cyber Crimes Unit for seven years.  He has been assigned to the Federal Bureau of Investigation (FBI) task force on violent crime since 2009 and has had extensive training in investigating child pornography.  His supervisor, Detective Sergeant Robert Muffler has had extensive training in cyber searching for child pornography.  Sgt. Muffler uses a software

program that searches the BitTorrent network for Internet Protocol (IP) addresses that share child pornography through peer-to-peer file sharing.  Each file has its own, unique hash value.  On August 4, 2013, Sgt. Muffler identified a computer with an IP address of 71.8.195.128 containing thirteen child pornography files, willing to share those files.  The files contained photographs and videos.  Detective Spreck viewed three of those files and confirmed that they contained child pornography.

2.      Detective Spreck subpoenaed Charter Communications regarding the location of the above IP address and on August 28, 2013, Charter provided the police with 3444 Delor, Apt. 2W, St. Louis, Missouri, and identified Defendant as being the person and address connected to that IP address.  A police officer contacted the Postal Service and confirmed that Defendant received mail at that residence.  On October 9, 2013, Ameren UE was also contacted and confirmed that the utilities at that address were billed to Defendant.

3.      On October 18, 2013, Detective Spreck prepared and presented a search warrant (Gov. Ex. 1) to a Missouri Circuit Court Judge.  Five days later, the search warrant was executed on Defendant's residence.  The affidavit supporting the search warrant contained the relevant information set out in paragraphs one and two above, including a description of the three files Detective Spreck viewed and confirmed as containing child pornography.  Prior to executing the search warrant, Detective Spreck learned that Defendant had an outstanding warrant for his arrest on an "No Fare Transit" charge.  Police officers surveilled Defendant's residence early in the morning of October 23, 2013, from their unmarked police vehicle.  At approximately 8:00 a.m., they observed an individual matching a photograph of Defendant in police possession.  The officers stopped Defendant, identified themselves as police officers, and advised Defendant of the pending arrest warrant and of the police investigation

relating to child pornography.  Defendant identified himself and his address and was arrested on the pending warrant.  No guns were drawn, and Defendant was not handcuffed at that time.  Defendant was patted down pursuant to his arrest and for the safety of the police officers.  The officer located Defendant's keys and seized an HTC cell phone.  Defendant was given the *Miranda*[1] warnings and stated that he understood the warnings.  He did not request an attorney, and no threats or promises were made by the police officers to induce his cooperation.  Defendant agreed to talk and was cooperative and coherent.  Defendant was provided the one-page search warrant to read and review.

4.     Defendant advised the police officers that he had peer-to-peer programs on his computers, a Dell desktop, and an ASUS laptop.  He stated that there was a computer in a brown bag near his door that belonged to a former girlfriend and not to him.  Defendant denied having any child pornography.  When asked by Detective Spreck for his keys to open the apartment door, Defendant voluntarily provided the keys to Spreck.  The keys were eventually left in Defendant's apartment after the searches.  The keys were not used to search a mailbox or a safe.  Several other officers arrived at Defendant's residence to assist in the search, including two forensic examiners, Detective Bobby Baine and Sgt. Muffler.  Defendant was handcuffed and placed in a patrol car during the search.  When handcuffing Defendant, Detective Spreck observed tattoos on Defendant's wrists and arms.  Detective Baine seized the two computers and all other items listed in the search warrant return.  (Gov. Ex. 1.)

---

[1]**Miranda v. Arizona**, 384 U.S. 436 (1966).

5.     Defendant was transported to the police station by Detective Spreck.  En route Defendant and Spreck talked about forensic examination of computers and the use of software by police.  At the police station, Defendant was placed in a chair next to Detective Spreck's desk.  Defendant's handcuffs were removed and Defendant removed his jacket or coat.  Detective Spreck provided Defendant the *Miranda* warnings again. Again, Defendant understood the warnings.  Defendant was not threatened or coerced by the police.  Defendant was coherent and cooperative.  Defendant asked to call his work and his sister and Detective Spreck provided Defendant with Defendant's seized HTC cell phone. The Detective obtained the name of "A.E.", Defendant's former girlfriend and the alleged owner of the computer in the bag at Defendant's residence, and another former girlfriend, "J.U."  The police officers did not search Defendant's cell phone until they later received a search warrant for the search.

6.     Detective Spreck was talking to Defendant during this time but did not consider the conversation an interrogation.   Spreck was waiting for Detective Baine to conduct a preliminary examination of Defendant's computers.  Detective Baine discovered thirteen photographs of child pornography on Defendant's computer, including a photograph included a child on a dark mattress being digitally sodomized by an adult hand.  The adult arm contained tattoos on the left forearm.   Children's clothing was also identifiable.   The photographs were taken with a cell phone.   Other bed covering was also identifiable. Detective Spreck asked Defendant to move his shirt sleeve so that he could take a photograph of Defendant's tattooed arm.  Defendant agreed to do so.  Defendant's shirt was not removed.

7.     Defendant was advised of the child pornography located on his computer and the information about the tattooed arm and the sodomy.  Defendant advised the detective that he met a woman named Michelle on Craig's List when investigating P-Mom or Pedo Mom

- 4 -

which relates to women who are pedophiles with children.  Defendant stated that he had sex with Michelle.  Days later, Michelle took child pornographic photos of her five-year old daughter; Defendant created a slide show with these photographs.  Defendant and Michelle had sex while watching the child pornography slide show.  Defendant then became agitated and asked Detective Spreck about the possible charges he faced.  Spreck advised Defendant of the possible charges.  Defendant stated "I'm fucked" and stood up from the chair. Detective Spreck stuck his arm out to prevent Defendant from standing and pushed Defendant back into the chair.  Defendant rose up with enough force that Spreck's wristwatch was pulled off of his arm and damaged.  Neither Defendant nor Detective Spreck were injured.  Defendant was advised of new charges of resisting arrest and assault.  Detective Spreck had no further contact with Defendant pursuant to Police Department policy.

8.      Detective Spreck planned to begin recording the interrogation of Defendant after Spreck learned of the sodomy photographs.  The interrogation was to be audio-taped in an interrogation room.  Defendant requested an attorney after the physical altercation and all questioning ceased.  Defendant was transported to a holding cell.

9.      Along with bed coverings, blankets, and other items, the detectives removed a colored mattress in Defendant's residence that was similar to the mattress depicted in the child pornography photographs.  Detective Spreck prepared and presented a search warrant to a Missouri Associate Circuit Judge to search Defendant's residence a second time for these items and any other items relevant to the child pornography investigation. (Gov. Ex 2.)  The search warrant was executed and signed on October 23, 2013, and items were seized as listed on the search warrant return.

- 5 -

10.    The detective investigated Defendant's public Facebook profile and observed photographs of J.U. and her daughter, who resembled the child in the child pornography photographs.  Detective Spreck contacted J.U. and advised her of the investigation.  J.U. advised the officer that her two daughters, C.U. and B.U., twelve and two years of age respectively, spent the night at Defendant's apartment on October 18, 2013, while J.U. completed some college requirements.  Redacted photographs of B.U. were presented to J.U.; she identified her daughter and her daughter's clothing.  J.U. provided the police officer with some of the clothing for DNA testing.

11.    A further search of Defendant's Dell computer revealed a search query on October 17, 2013, for a child's dosage of trazodone, an anti-depressant that causes drowsiness.  The detective also located a video of two children in Defendant's bathroom undressing and using the bathroom facilities.

12.    On October 30, 2013, Detective Spreck prepared and presented a search warrant to a Missouri Associate Circuit Court Judge to search Defendant's residence for camera equipment, narcotics, and medication.  (Gov. Ex. 3.)  The search warrant was executed that same day and items were seized as listed on the search warrant return.  Included among the items seized was a pill container issued to Defendant of 50 milligram dosages of trazodone and a hidden camera.

13.    Detective Wilferd booked Defendant after Defendant requested an attorney.  Part of the booking procedure is to determine if a prisoner is taking any medication.  If so, that information is listed on the booking forms and provided to the jail to assist prisoners and the jail in addressing prisoners' medical needs.  Defendant advised Detective Wilfred that he was not taking any medication.   Detective Wilfred transported Defendant from Police

Headquarters to the City Justice Center.  Defendant advised the detective that he needed to see his psychiatrist due to the events of the day.  The detective asked Defendant why he required a psychiatrist and Defendant replied that he was being treated for depression.

14.     On October 30, 2013, Detective Spreck prepared and presented a search warrant for Defendant's HTC cell phone to a Missouri Associate Circuit Court Judge. (Gov. Ex. 5.) The cell phone was not searched until the search warrant was signed by the judge.

15.     Detective Spreck is not certain if he left the search warrant and affidavit at Defendant's residence during the initial search.  (See Gov. Ex. 1.)  If the search warrant was not left at Defendant's residence, the omission was inadvertent and not intentional.  All other search warrants were left at Defendant's residence.

16.     On October 30, 2013, Detective Spreck prepared and presented a search warrant to a Missouri Associate Circuit Court Judge for two buccal swabs from Defendant relating to the DNA investigation of the children's clothing. (Gov. Ex. 4.) Detective Wilfred collected the samples from Defendant at the St. Louis Justice Center where Defendant was incarcerated.

17.     Under Mo.Rev.Stat. § 590.700.2, all custodial interrogations of persons suspected of committing various crimes including forceable sodomy shall be recorded when feasible.  The statute further provides that nothing in the statute shall be construed as a ground to exclude evidence.

### Conclusions of Law

A.     **Defendant's Motion to Suppress Evidence.**

Defendant moves to suppress all evidence seized by the police, whether from his residence or his person.  The original search warrant (Gov. Ex. 1.) is a result of an

investigation that began on August 4, 2013, by Sgt. Muffler.  Detective Spreck began the leg work on that investigation, researching information on the location of the IP address and on recipients of mail at that address, including an Ameren UE utility bill for the address and listing Defendant.  Detective Spreck then prepared the search warrant supported by a ten-page affidavit which provided a lot of details on the child pornography investigation and Defendant's residence.  Having carefully read and reviewed each of the five search warrants, the Court concludes that each contains sufficient information to create probable cause.  The descriptions of the items to be seized are specific and relate to the investigation.  The facts articulated describe a thorough investigation of the crime of possession/production of child pornography.

The first search warrant was presented to a state court judge on October 18, 2013, and executed on October 23, 2013.  Following this execution, additional information and evidence was received and reviewed by the police.  The extended investigation lead to the pursuit of additional search warrants.  Detective Spreck observed a tattoo on Defendant's forearm and recalled a similar tattoo on the child pornography along with a dark-colored mattress and bedding that was in Defendant's residence.  This lead to the second search warrant.  Additional information was obtained from the search of Defendant's computer, including Defendant searching the internet for child dosages of specific medication.  That information was included in the affidavit for the third search warrant.  There was evidence relating to children's clothing and digital sodomy of children.  This resulted in the request for a fourth search warrant to obtain DNA samples from Defendant.  Finally, the cell phone seized from Defendant at his arrest was the basis for the fifth and final search warrant.  All five search warrants contain sufficient probable cause to justify the search warrants.

To be valid, search warrants must be based upon a finding by a neutral and detached judicial officer that there is probable cause to believe that evidence, instrumentalities or fruits of a crime, contraband, or a person for whose arrest there is probable cause, may be found in the place to be searched.  **Johnson v. United States**, 333 U.S. 10 (1948); **Warden v. Hayden**, 387 U.S. 294 (1967); Fed.R.Crim.P. Rule 41.  The quantum of evidence needed to meet this probable cause standard has been addressed by the Supreme Court on numerous occasions.  "In dealing with probable cause . . . as the very name implies, we deal with probabilities.  These are not technical; they are factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." **Brinegar v. United States**, 338 U.S. 160, 176 (1949).  Probable cause is "a fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules."  **Illinois v. Gates**, 462 U.S. 213, 232 (1983).  Applications and affidavits should be read with common sense and not in a grudging, hypertechnical fashion.  **United States v. Ventresca**, 380 U.S. 102, 109 (1965).  Probable cause may be found in hearsay statements from reliable persons, **Gates**, 462 U.S. at 245; in hearsay statements from confidential informants corroborated by independent investigation, **Draper v. United States**, 358 U.S. 307, 313 (1959); or in observations made by trained law enforcement officers, **McDonald v. United States**, 335 U.S. 451, 454 (1948).  While these are some of the ways in which probable cause is commonly established, they are by no means all-inclusive.  Information contained in applications and affidavits for search warrants must be examined in the totality of the circumstances presented.  **Gates**, 462 U.S. at 230.  Once

a judicial officer has issued a warrant upon a finding of probable cause, that finding deserves great deference if there is a substantial basis for the finding.  **Id**, at 236.

Defendant argues that the information in the search warrants was stale.  The investigation began on August 4, 2013, and the search warrant was signed by a state court judge on October 18, 2013, approximately two months after the initial information regarding child pornography was discovered and related to the IP address.

"The timeliness of the information supplied in an affidavit depends on the circumstances of the case, including the nature of the crime under investigation."  **United States v. Smith**, 266 F.3d 902, 904-05 (8th Cir. 2001) (citing United States v. Koelling, 992 F.2d 817, 822 (8th Cir. 1993)).  "'[T]here is no bright-line test for determining when information is stale . . . and the vitality of probable cause cannot be quantified by simply counting the number of days between the occurrence of the facts supplied and the issuance of the affidavit.'"  **United States v. Tyler**, 238 F.3d 1036, 1039 (8th Cir. 2001) (quoting Koelling, 992 F.2d at 822) (second alteration in original).  The question of staleness was addressed in the context of child pornography in **United States v. Horn**, 187 F.3d 781 (8th Cir. 1999).  In that case, the court held that "there was a fair probability" that the defendant would still be in possession of child pornography received three or four months earlier.  **Id.** at 787.  And, in **United States v. Chrobak**, 289 F.3d 1043, 1046 (8th Cir. 2002), the court held that child pornography images transmitted ninety-one days prior to the execution of a search warrant were not too stale to provide probable cause for that warrant.

For the foregoing reasons, the information in the affidavit supporting the search warrant is timely under the circumstances of this case.

- 10 -

Upon the execution of the first search warrant, Defendant was arrested, advised of the investigation, patted down for safety of the police officers and arrested on a pending warrant for "No Fare Transit."   There was a pending warrant for the arrest of Defendant, and, therefore, the arrest was valid.  See **Steagald v. United States**, 451 U.S. 204, 213 (1981); **United States v. West**, 517 F.2d 483, 485 (8th Cir. 1975).  Additionally, "[a] lawful arrest warrant carries with it the authority to enter the residence of the person named in the warrant in order to execute the warrant as long as the officers executing the warrant have a reasonable belief that the suspect resides at and is currently present at the dwelling." **United States v. Lloyd**, 396 F.3d 948, 952 (8th Cir. 2005) (citing Payton v. New York, 445 U.S. 573, 602-03 (1980)).  Accord **United States v. Clayton**, 210 F.3d 841, 843 (8th Cir. 2000).  "This rule applies to misdemeanor warrants as well as to those for felonies." **Lloyd**, 396 F.3d at 952 (citing United States v. Smith, 363 F.3d 811, 814 (8th Cir. 2004)).

A police officer may search a person incident to a valid custodial arrest of that person. **United States v. Robinson**, 414 U.S. 218, 235 (1973). "A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to arrest requires no additional justification." **Id.**  "It is the fact of the lawful arrest which establishes the authority to search." **Id.**  Accord **New York v. Belton**, 453 U.S. 454, 461 (1981); **United States v. Lewis**, 183 F.3d 791, 794 (8th Cir. 1999).

Defendant argues that a Rule 41 violation occurred because Defendant was never provided a copy of the search warrant.  Detective Spreck testified that upon Defendant's arrest, he was allowed to read and review the actual one-page search warrant signed by the

- 11 -

judge.  Detective Spreck further testified that he intended to leave the first search warrant at Defendant's residence, but does not remember if he did so.  If he did not, it was unintentional and "human error."

Rule 41(f)(1)(C) of the Federal Rules of Criminal Procedure provides that the officer executing a search warrant "must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken or leave a copy of the warrant and receipt at the place where the officer too the property."  "There are two categories of Rule 41 violations:  those involving constitutional violations, and all others."  **United States v. Simons**, 206 F.3d 392, 403 (4th Cir. 2000) (citations omitted).  When the procedure required by Rule 41 is not followed by an officer, "suppression of the fruits of the search warrant is not required absent a showing of (1) 'prejudice in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed,' or (2) 'evidence of intentional and deliberate disregard of a provision in the Rule.'"  **United States v. Burgard**, 551 F.2d 190, 193 (8th Cir. 1977) (quoting United States v. Burke, 517 F.2d 377, 386-87 (2nd Cir. 1975)).  Failure to provide a copy of a search warrant to the person whose property was taken "does not render the search unreasonable under the Fourth Amendment."  **Simons**, 206 F.3d at 403.  Nor does this failure infringe on a defendant's constitutional rights.  **Id.**

After viewing some of the child pornography on Defendant's computers, the officers noticed a tattoo on the arm of the adult sodomizing a small child.  Detective Spreck observed a similar tattoo on Defendant's forearm when handcuffs were being placed on Defendant.  At the police station, Defendant removed his jacket or coat.  He was wearing a long sleeve

shirt or sweat shirt, and voluntarily raised his shirt sleeve to permit the police to photograph his arm.  Citing **Pace v. City of Des Moines**, 201 F.3d 1050 (8th Cir. 2000), Defendant argues that this is a violation of the Fourth Amendment.

In **Pace**, the court held that ordering a suspect to remove his shirt so that a photograph could be taken of a tattoo on his chest violated the Fourth Amendment.  **Id.** at 1053-54. Responding to a report of an assault with a knife, a police officer entered the business building, flashed his firearm, and told the suspect to step outside, at which time the officer pushed the suspect against a wall and ordered him to remove his shirt so that the officer could photograph a tattoo on the suspect's chest.  **Id.** 1052-53.  The court held that the officer's conduct was too intrusive and involved excessive fear and more humiliation than was required under the circumstances.  **Id.** 1054.  On the other hand, in **Schmidt v. City of Bella Villa**, 557 F.3d 564, 567, 572-73 (8th Cir. 2009), the court held that a strip search procedure requiring a photograph of a tattoo two inches from a woman's hip bone, necessitating that the woman unbutton her jean pants and fold the jeans inward did not violate the Fourth Amendment.  The court held that, under the balancing factors in **Bell v. Wolfish**, 441 U.S. 520 (1979), a constitutional violation had not occurred.  **Id**. at 572-73 "under Bell, courts must consider (1) the justification for initiating the search, (2) the scope of the particular intrusion, (3) the place in which the search is conducted, and (4) the manner in which it is conducted."  **Id**. at 572.  Employing the **Bell** factors, a raised shirt sleeve clearly does not rise to the level of a constitutional violation.

- 13 -

Defendant alleges that he was assaulted by Detective Spreck at the police station, but the evidence does not support that allegation. There is no evidence that the police forcibly took Defendant's house keys.

For the foregoing reasons, Defendant's motion to suppress evidence is without merit and should be denied.

### B.    Defendant's Motion to Suppress Statements.

There is uncontroverted evidence that Defendant was provided the *Miranda* warnings upon his arrest and again at the police station. Defendant understood the warnings and was coherent. There is no evidence of threats, force, coercion or promises made to Defendant in return for his cooperation. Defendant voluntarily talked with the police after being given the *Miranda* warnings. After Defendant learned that the police had photographs of Defendant and a minor child, Defendant became agitated and had to be subdued. It was then that he requested a lawyer. Questioning ceased.

Generally, statements to law enforcement officers are subject to those procedures set out in **Miranda**, 384 U.S. at 436. The law enforcement officer must inform the defendant of his or her rights prior to questioning. **Id.** at 444. The *Miranda* warnings, however, are required only when the suspect is in custody and subjected to interrogation. **Id.** at 477-78. Custodial interrogation means questioning initiated by the law enforcement officer after the suspect has been taken into custody. **Illinois v. Perkins**, 496 U.S. 292, 297 (1990). Voluntary statements by a suspect not being questioned are, of course, admissible at trial. **Rhode Island v. Innis**, 446 U.S. 291, 300-01 (1980). Moreover, if, after being given *Miranda* warnings, a defendant agrees to make a statement, the government must show that

the waiver was voluntary, knowing, and intelligent for the statement to be admissible. **Colorado v. Connelly**, 479 U.S. 157, 169-70 (1986); **North Carolina v. Butler**, 441 U.S. 369, 375-76 (1979); **Miranda**, 384 U.S. at 475.  Routine booking questions are reasonably related to police record-keeping and, therefore, are not related to the cautions of *Miranda*. **Pennsylvania v. Muniz**, 496 U.S. 582, 600-02 (1990); **United States v. Reyes**, 908 F.2d 281, 287-88 (8th Cir. 1990).  See also **United States v. Klein**, 13 F.3d 1182, 1184 (8th Cir. 1994) (*Miranda* warnings not required for "general on the scene" questioning).

After a defendant expresses a desire to have an attorney present during questioning, he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." **Edwards v. Arizona**, 451 U.S. 477, 484-85 (1981).  See also **Minnick v. Mississippi**, 498 U.S. 146, 156 (1990) (holding to same effect); **Henderson v. Dugger**, 925 F.2d 1309, 1312 (11th Cir. 1991) (defendant validly waived his right to interrogation without counsel when, after invoking his right to counsel, defendant asked a question relating to his crime).

After Defendant requested counsel, the interrogation ceased and Defendant was taken to a holding cell.  Defendant was subsequently booked by Detective Wilferd.  It is police procedure to ask a person what medications the person is taking so that the information can be provided to the jail.  Detective Wilferd asked Defendant that question and Defendant answered.  As noted above, asking routine booking questions is not interrogation under *Miranda*. **United States v. Ochoa-Gonzalez**, 598 F.3d 1033, 1038 (8th Cir. 2010).  Accord **United States v. Brown**, 101 F.3d 1272, 1274 (8th Cir. 1996) (routine biographical data is

- 15 -

exempted from *Miranda); **United States. v. McLaughlin**, 777 F.2d 388, 391 (8th Cir. 1985) (inquiries to a suspect in custody about such biographical data as name, address, years of marriage, and number of children are routine booking questions and are admissible).  This is true even if the information turns out to be incriminating.  **Id.** at 391.  The Court finds that the detective's question about Defendant's medication was a routine booking question.  Detective Wilfred testified that this question is always asked and that the jail requires that information and a copy of the booking sheet.

Defendant also argues that the statement he made in the police car to Detective Wilferd should be suppressed.  All interrogation of Defendant stopped after he invoked his right to counsel.  In the car, Defendant voluntarily and without provocation or questioning, advised Detective Wilferd that he needed to see his psychiatrist.  The detective asked why Defendant was seeing a psychiatrist; Defendant responded that he suffered from depression.

Custodial interrogation means questioning initiated by law enforcement officers after a person has been deprived of his freedom of action in some significant way.  **Miranda**, 384 U.S. at 467-73.  The proscription of *Miranda* applies only to questioning initiated by police officers.  **Rhode Island**, 446 U.S. at 300.  "'Interrogation' . . . must reflect a measure of compulsion above and beyond that inherent in custody itself."  **Id.**  Thus, "*Miranda* does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer."  **United States v. Chipps**, 410 F.3d 438, 445 (8th Cir. 2005); accord **United States v. McCoy**, 200 F.3d 582, 584 (8th Cir. 2003) (per curiam).

Finally, Defendant cites Mo.Rev.Stat. § 590.700.2 requiring that his interview by police be recorded[2] in support of his suppression argument.  Assuming, without deciding, that the police violated the statute, the plain language of the § 590.700.6 provides that "[n]othing in this section shall be construed as a ground to exclude evidence . . . .  Compliance or noncompliance with this section shall not be admitted as evidence, argued, referenced, considered or questioned during a criminal trial."  Defendant's argument is unavailing.

For the foregoing reasons, Defendant's motion to suppress his statements should also be denied.


/s/ Thomas C. Mummert, III
THOMAS C. MUMMERT, III
UNITED STATES MAGISTRATE JUDGE


Dated this 3rd day of March, 2015.

---

[2] Section 590.700.2 provides, in relevant part, that "[a]ll custodial interrogations of persons suspected of committing or attempting to commit . . . child abuse, or child kidnapping shall be recorded when feasible."